IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

WILLIAM D. DAVIS,

        Plaintiff,

    v.                             Civil Action No. 2:07-CV-53

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

## REPORT AND RECOMMENDATION
## SOCIAL SECURITY

### I. Introduction

A.    <u>Background</u>

Plaintiff, William D. Davis, (Claimant), filed his Complaint on July 10, 2007, seeking

Judicial review pursuant to 42 U.S.C. §§ 405(g) of an adverse decision by Defendant,

Commissioner of Social Security, (Commissioner).[1]  Commissioner filed his Answer on October

4, 2007.[2]  Claimant filed his Motion for Summary Judgment on November 2, 2007.[3]

Commissioner filed his Motion for Summary Judgment on January 3, 2008.[4,5]  Claimant filed his

---

[1] Docket No. 1.

[2] Docket No. 8.

[3] Docket No. 11.

[4] Docket No. 14.

[5] **It is disappointing Commissioner's Motion failed to directly address the first issue raised by Claimant, <u>and</u> failed to address the remaining issues in the same order presented in Claimant's Motion.  This is especially so because it violates Local Rule 83.12 (c), which states, "[t]he defendant is specifically directed to address all of the contentions and arguments made by the plaintiff in the same order in which the plaintiff has stated them in his or her brief."  LR Gen P 83.12(c).**

Response to Commissioner's Motion on January 17, 2008.[6]

B.    The Pleadings

    1.    Plaintiff's Brief in Support of Motion for Summary Judgment.

    2.    Defendant's Brief in Support of His Motion for Summary Judgment.

    3.    Plaintiff's Response to Defendant's Motion for Summary Judgment.

C.    Recommendation

I recommend that:

    1.    Claimant's Motion for Summary Judgment be **GRANTED** because although there is no merit to Claimant's first contention, harmless error marred the ALJ's hypothetical to the Vocational Expert, ["VE"], and the ALJ properly evaluated the reports of Dr. Nelson, Dr. Labatia, and Dr. Franyutti, the ALJ erroneously dismissed Ms. Wentz's opinions as being from an unacceptable medical source.  Because it is not the Court's role to weigh the evidence, the Court recommends remand for further consideration of Ms. Wentz's reports and their bearing on Claimant's credibility and RFC.

    2.    Commissioner's Motion for Summary Judgment be **DENIED** for the same reasons set forth above.

## II.  Facts

A.    Procedural History

 Claimant filed an application for Disability Insurance Benefits and Supplemental Security Income on July 20, 2004, alleging disability since March 31, 2003 due to carpal tunnel syndrome, and problems with his back, neck, shoulder, legs and feet.  The application was

---

[6] Docket No. 15

initially denied on December 7, 2004 and upon reconsideration on June 1, 2005. Claimant

requested a hearing before an ALJ and received a hearing on May 23, 2006. On November 16,

2006, the ALJ issued a decision adverse to Claimant. Claimant requested review by the Appeals

Council but was denied. Claimant filed this action, which proceeded as set forth above.

B.    Personal History

Claimant was 45 years old on the date of the May 23, 2006 hearing before the ALJ.

Claimant completed high school and has prior work experience as a well tender, servicing wells,

repairing pipelines, and driving four-wheeled trucks. (Tr. 56)

C.    Medical History

The following medical history is relevant to the time period during which the ALJ

concluded that Claimant was not under a disability: March 31, 2003 through November 16,

2006:

**United Hospital Center, 2/2/02 (Tr. 114)**
Impression:1) ATV crash; 2) Muscle strain; 3) Left Scaphoid fracture

**United Hospital Center, 2/2/02 (Tr. 121)**
Impression: 1) Limited visualization of T2 on lateral view; otherwise, unremarkable thoracic
spine series.
Impression: 1) Fracture pf the scaphoid as described.

**United Hospital Center, 2/2/02 (Tr. 122)**
Impression: 1) No acute fracture or subluxation of the visualized lumbar vertebral bodies.

**United Hospital Center, 2/2/02 (Tr. 123)**
Impression: 1) No acute lung infiltrates.

**John T. Travis, ATC, MS, PT, 10/16/03 (Tr. 130)**
Assessment: Cervical strain/lumbar strain.

**John T. Travis, ATC, MS, PT, 4/14/03 (Tr. 136)**
Assessment: Cervical strain/lumbar strain.

**John T. Travis, ATC, MS, PT, 2/26/02 (Tr. 145)**
Assessment: Cervical strain, lumbar strain

**Dr. Richard T. Gross, Ph.D., 4/9/04 (Tr. 146)**
Recommendation/Plan:
-Patient very reluctant to return to work and "push the limit" until scheduled MRI of shoulder is completed. He expresses he could harm himself and needs the reassurance regarding MRI findings prior to feeling safe to work. He also expresses a willingness to return to work with pain once the MRI has been completed and is cleared to safely work. Mr. Davis will need a great deal of education and reassurance from his treating physician once released to return to work on the safety of returning to work despite continued pain.
-After completion of MRI and if no new pathology identified, recommendation is for Release to return to work within the guidelines of discharge physical capabilities (Medium PDC), work simulation capabilities, and the recommendations of treating physicians.
-It is our understanding that a job will be offered to Mr. Davis by his employer either with his previous company Rare Earth Minerals or with a furniture company also owned by his employer.
-From an emotional psychological standpoint, the patient is capable of full-time gainful employment. The patient is not in need of further psychological services. If such need arises, education/coping skills sessions are available free of charge from Oasis Occupational Rehabilitation for all patients who successfully complete the program.
-Patient would benefit from participation in a self-directed fitness program to enhance gains achieved during the 4-week program and indicates his intention to do so having obtained a treadmill for home use.
-In summary, we are very pleased with the gains Mr. Davis achieved over the course of treatment in terms of improved physical capabilities and coping with his pain. We feel he is much better equipped to deal with both the physical as well as emotional stressors associated with eventual return to work.

**Dr. Ihab Y. Labatia, M.D., 10/29/04 (Tr. 151)**
Assessment: This is a nice 44 YO gentleman with main complaints of right shoulder pain, neck pain, and low back pain. His right shoulder pain is most likely a combination of impingement syndrome and osteoarthritis and bicipital tendonitis. His neck pain appears to be most likely mechanical secondary to cervical spondylosis although there is clinical signs of right cervical radiculopathy as shown by impaired pinprick sensation in the right C-5 and C-8 dermatomes. His lower back pain appears also most likely mechanical secondary to combination of bilateral sacroiliac joint arthopathy and lumbar spondylosis. There is no clinical evidence of lumbar radiculopathy noted.

Recommendation:
1) I don't think patient will be able to function reasonably at any job setting due to combination of multiple problems that result in significantly impaired ability to stand, walk, or sit and there is also significant impairments in ability to do any reasonable lifting, pulling, pushing, bending, stopping, or twisting.
2) Patient will also not be able to climb ladders at work and he will not be able to do any

reasonable amount of driving due to his impaired ability to sit and due to impaired ROM in the cervical spine region.

**Dr. Franyutti, M.D., DDS Physician, 11/22/04 (Tr. 156)**
Physical Residual Functional Capacity
Exertional Limitations:
> Occasionally lift and/or carry: 20 pounds
> Frequently lift and/or carry: 10 pounds
> Stand and/or walk: at least 2 hours in an 8 hour workday
> Sit: about 6 hours in an 8-hour workday
> Push and/or pull: unlimited, other than as shown for lift and/or carry.

Postural Limitations:
> Ladder/rope/scaffolds: Never

Manipulative Limitations:
> Reaching all directions: limited

Visual Limitations: None established
Communicative Limitations: None established
Environmental Limitations:
> Extreme cold/heat: avoid concentrated exposure
> Hazards: avoid concentrated exposure

Symptoms: Patient is credible, allegations are supported by findings; Patient with arthralgias affecting multiple joints with paraspinal muscle spasms . . . and pain in extremities, all considered in RFC reduced to sedentary.

Treating or examining source statements: 10/29/04 Ihab Y. Labatia, M.D: "I do not think patient will be able to function reasonably at any job setting due to combination of multiple problems that result in significantly impaired ability to stand, walk, or sit and there is also significant impairments in ability to do any reasonable lifting, pulling, pushing, bending, stooping, or twisting.  Patient will also not be able to climb ladders at work and he will not be able to do any reasonable amount of driving due to his impaired ability to sit and due to impaired ROM in the cervical spine region."

I disagree with Dr. Labatia, currently patient could perform sedentary work based on findings, object evidence.

**Medbrook Medical Associates, 3/16/05 (Tr. 167)**
Provisional Diagnosis: 1) Lumbar Strain; 2) ___ .

**Medbrook Medical Associates, 2/23/05 (Tr. 168)**
Provisional Diagnosis: 1) Lumbar strain; 2) ___; 3) lumbago; 4) cervical strain/spasm; 5) ___.

**Medbrook Medical Associates, 1/24/05 (Tr. 169)**
Provisional Diagnosis: 1) CTS; 2) lumbago; 3) ___; 4) Disc ___.

**RaEtta Wentz, PA-C, Medbrook Medical Associates, 1/24/05 (Tr. 170)**
Patient is unable to work at this time till future testing is complete.

**Medbrook Medical Associates, 1/5/05 (Tr. 171)**
<u>Provisional Diagnosis</u>: 1) lumbar strain; 2) lumbago; 3) ___; 4) ___; 5) arm swelling.

**Medbrook Medical Associates, 11/29/04 (Tr. 172)**
<u>Provisional Diagnosis</u>: 1) chronic neck pain; 2) lumbago.

**Medbrook Medical Associates, 1029/04 (Tr. 174)**
<u>Assessment</u>: Pain

**Medbrook Medical Associates, 9/5/04 (Tr. 177)**
<u>Assessment</u>: Exacerbation of chronic back pain.

**Medbrook Medical Associates, 8/27/04 (Tr. 178)**
<u>Assessment</u>: 1) cervical strain; 2) lumbago; 3) headache.

**Medbrook Medical Associates, 8/6/04 (Tr. 179)**
<u>Assessment</u>: Cervical strain. Secondary cephalgia due to pain in the neck.

**Medbrook Medical Associates, 7/19/04 (Tr. 180)**
<u>Assessment</u>: Spasm in the lower back.

**RaEtta Wentz, PA-C, Medbrook Medical Associates, 7/19/04(Tr. 181)**
Patient is unable to actively do any work at this time.

**Medbrook Medical Associates, 6/28/04 (Tr. 182)**
<u>Assessment/Plan</u>: Refilled his medications.  Return if any problems develop.

**Medbrook Medical Associates, 5/10/04 (Tr. 190)**
<u>Assessment</u>: Degenerative disk disease of the cervical spine with spasm and trapezius strain, lumbar strain, herniation.

**Medbrook Medical Associates, 4/17/04 (Tr. 191)**
<u>Assessment</u>: Cervical strain with herniation; lumbar strain.

**Medbrook Medical Associates, 4/3/04 (Tr. 192)**
<u>Assessment</u>: Cervical strain with herniation; lumbar strain.

**Medbrook Medical Associates, April/May 2004 (Tr. 193)**
<u>Assessment</u>: Cervical strain with headache.

**Medbrook Medical Associates, 3/20/04 (Tr. 194)**

<u>Assessment</u>: He is able to return to Oasis on Monday.  Follow-up here if any new complaints or problems develop.

**<u>Medbrook Medical Associates, 2/4/04 (Tr. 201)</u>**
<u>Assessment</u>: Lumbar strain; cervical strain; disk bulging.

**<u>Medbrook Medical Associates, 12/1/03 (Tr. 205)</u>**
<u>Assessment</u>: Cervical strain; wrist pain; low back pain.

**<u>Medbrook Medical Associates, 10103 (Tr. 212)</u>**
<u>Assessment</u>: Low back pain, old injury, acute flare up with radiculopathy.

**<u>Medbrook Medical Associates, 9/5/03 (Tr. 214)</u>**
<u>Assessment</u>: 1) Cervical strain; 2) Lumbar strain.

**<u>Medbrook Medical Associates, 8/11/03 (Tr. 216)</u>**
<u>Assessment</u>: Cervical strain. Lumbar strain.

**<u>Medbrook Medical Associates, 7/11/03 (Tr. 220)</u>**
<u>Assessment</u>: Back strain; Pain in the limb; Follow up scaphoid fracture.

**<u>Medbrook Medical Associates, 4/28/03 (Tr. 223)</u>**
<u>Assessment</u>: Cervical and lumbar strain with radiculopathy going down the right leg and actually the left wrist is hurting also.

**<u>Medbrook Medical Associates, 3/31/03 (Tr. 225)</u>**
<u>Assessment</u>: Lumbar pain, sciatica with radiculopathy.

**<u>Medbrook Medical Associates, 2/10/03 (Tr. 226)</u>**
<u>Assessment</u>: 1) Lumbar strain; 2) Thoracic strain; 3) Cervical strain.

**<u>Medbrook Medical Associates, 1/22/03 (Tr. 228)</u>**
<u>Assessment</u>: Lumbar strain.

**<u>Medbrook Medical Associates, 2/12/02 (Tr. 238)</u>**
<u>Assessment</u>: Lumbar strain, cervical strain and scaffolding structure.

**<u>United Hospital Center, 2/5/02 (Tr. 241)</u>**
<u>Impression</u>: Small bone island, but no acute abnormality is identified of the pelvis or hip.

**<u>United Hospital Center, 2/5/02 (Tr. 242)</u>**
<u>Impression</u>: No acute abnormality is identified within the abdomen with no evidence for obstruction or free air.

**United Hospital Center, 2/5/02 (Tr. 243)**
Impression: Mild central annular bulge at the level of the lumbosacral interspace.

**United Hospital Center, 12/9/02 (Tr. 244)**
Impression: No evidence of fracture.

**United Hospital Center, 1/22/03 (Tr. 245)**
Impression: 1) Unremarkable cervical spine series; no acute fracture or subluxation; 2) Limited evaluation of the odontoid tip.

**Medbrook Medical Associates, 4/29/03 (Tr. 247)**
Impression: Negative duplex venous ultrasound.

**United Hospital Center, 6/8/03 (Tr. 248)**
Impression: No acute abnormality.

**United Hospital Center, 6/8/03 (Tr. 249)**
Impression:
1) Diffuse central disc bulge at L5-S1. This appears in close proximity to the S1 nerve roots bilaterally, especially on the left side within the thecal sac.
2) Diffuse central disc bulge at L4-5 without significant central or lateral spinal canal stenosis. Otherwise, the study is unremarkable.

**United Hospital Center, 6/8/03 (Tr. 251)**
Impression: Mild diffuse disc bulge at C5-6 without significant central or lateral spinal canal stenosis. The neural foramina are patent. Otherwise, the study is unremarkable.

**United Hospital Center, 7/11/03 (Tr. 252)**
Impression: No bony abnormality is noted in the left wrist.

**United Hospital Center, 10/15/03 (Tr. 256)**
Impression: This study is abnormal and is supportive of:
1) bilateral carpal tunnel syndrome.
2) The study did not show evidence of denervation and was not supportive of C5-T1 or L3-S1 radiculopathy on either side.

**United Hospital Center, 1/12/04 (Tr. 257)**
Impression: No evidence of fracture.

**United Hospital Center, 5/10/04 (Tr. 258)**
Impression: No evidence of DVT.

**United Hospital Center, 5/12/04 (Tr. 260)**
Impression:1) Question some mild widening of the right AC joint when stressed; 2) Early

degenerative changes left AC joint.  No instability seen on the left.

**United Hospital Center, 5/12/04  (Tr. 261)**
<u>Impression</u>: No evidence of fracture.

**United Hospital Center, 4/23/05  (Tr. 264)**
<u>Impression</u>: No acute disease seen.  Small spur at the intersection of the Achilles tendon.

**Medbrook Medical Associates, 11/28/05 (Tr. 281)**
<u>Assessment</u>: 1) Low back pain; 2) Disk herniation.

**Medbrook Medical Associates, 8/15/05 (Tr. 282)**
<u>Assessment</u>: Back pain and headache.

**Medbrook Medical Associates, 8/10/05 (Tr. 283)**
<u>Assessment</u>: Cervical spasm, acute.  Cervical strain.

**Medbrook Medical Associates, 7/31/05 (Tr. 284)**
<u>Assessment</u>: Back pain.

**Medbrook Medical Associates, 7/25/05 (Tr. 286)**
<u>Assessment</u>: Low back pain.

**Medbrook Medical Associates, 7/2/05 (Tr. 287)**
<u>Assessment</u>: Right elbow lateral tendonitis.  Lumbago.  Cervical strain.  Hypertension.
Hyperlipidemia.

**RaEtta Wentz, PA-C, 1/4/06 (Tr. 290)**
<u>Medical Assessment of Ability to Do Work-Related Activities (Physical)</u>
Are lifting/carrying affected by this impairment? Yes
      Can carry 10 pounds or less.
      Can carry "very little" occasionally.
      What are the medical findings that support this assessment? See MRI lumbar and cervical
          sprain.
Are standing/walking affected by this impairment? Yes
      Can stand and/or walk 2 hours in 8 hour workday.
      Can stand and/or walk without interruption for 30 minutes in 8 hour workday.
      What are the medical findings that support this assessment? Pain increases, must change
          positions.
Is sitting affected by this impairment? Yes
      Can sit for 3 hours in 8 hour workday.
      Can sit without interruption for 30 minutes in 8 hour workday.
      What are the medical findings that support this assessment? Pain must ___.
How often can the individual perform the following postural activities?

Climb: never
Balance: never
Stoop: never
Kneel: never
Crawl: never
Are the following physical functions affected by this impairment?
Reaching: Yes, pain in upper ext.
Handling: Yes, CTS
Feelings: Yes, depression at times.
Pushing/Pulling: Yes
Seeing: No
Hearing: No
Speaking: No
What are the medical findings that support this assessment? + EMG
Are there environmental restrictions caused by this impairment?
Heights: Yes, unable to climb.
Moving machinery: Yes, with meds.
Temperature Extremes: No
Chemicals: No
Dust: No
Fumes: No
Humidity: No
Vibration: Yes, increased vibration increases pain.
Other: No
What are the medical findings that support this assessment? See MRI , + CTS, R upper
Ext.

**RaEtta Wentz, PA-C, 12/5/05 (Tr. 293)**
Patient was seen and evaluated for back injury; Medically unable to participate in work from
4/03 till present.

**Medbrook Medical Associates, 5/15/06 (Tr. 295)**
Assessment: Acute cervical spasm, chronic cervical disk herniation.

**Medbrook Medical Associates, 5/8/06 (Tr. 297)**
Assessment: Migraine, neck spasm, and nausea.

**Medbrook Medical Associates, 4/19/06 (Tr. 299)**
Assessment: Migraine, neck spasm, and nausea.

**Medbrook Medical Associates, 2/1/06 (Tr. 300)**
Assessment: Lumbar strain.

**Medbrook Medical Associates, 3/15/06 (Tr. 301)**

Assessment: Acute lumbar strain; Lumbago.

**Medbrook Medical Associates, 3/6/06 (Tr. 303)**
Assessment: Lumbago; Carpal Tunnel Syndrome; Sprain; Headache.

**Medbrook Medical Associates, 12/23/06 (Tr. 304)**
Assessment: Lumbar strain.

**Dr. Johnny Dy, M.D., 5/4/05, (Tr. 306)**
Impression: Chronic low back strain with bilateral lumbosacral radiculopathy.  Associated chronic cervical strain.
In view of his persistent low back pain and stiffness with restriction in range of motion of the lumbar spine with pain often radiating down both lower extremities despite of not doing gainful work since April 2003, I would recommend that he be granted 8% permanent partial disability for his back injury.  I used the Fourth Edition of the AMA Guide to the Evaluation of Permanent Impairment as a guide in rendering my recommendation.  Using table 81 on page 128, he has restriction in flexion of the lumbar spine at 30 degrees.  For that, I would recommend 4% permanent partial disability.  Using the same table, he has restriction in extension of the lumbar spine at 7 degrees.  For that, I would recommend 2% permanent partial disability.  Using Table 82 on page 130, he has restriction in lateral flexion of his back to the right at 20 degrees and to the left also at 20 degrees.  For that, I would recommend 2% permanent partial disability.  Adding these up would give him a total of 8% permanent partial disability for his low back injury.  He also suffers from chronic cervical strain with restriction in range of motion of the cervical spine with pain often radiating to the right shoulder and upper extremity.  For that, I would recommend 5% permanent partial disability.  Using Table 85-20-E, PPD ranges for cervical disorder, he would fall under cervical category 2 with impairment of whole person ranging from 5% to 8% for his neck injury. For that, I would recommend 5% permanent partial disability for his cervical spine injury.  Adding these up would give him a total of 13% permanent partial disability for his low back and cervical spine injury sustained on January 29, 2002.

**Dr. Joseph A. Snead, M.D., 9/12/05 (Tr. 309)**
Diagnosis:
1) This man has cervical and lumbar spine strain/sprain with some evidence of lumbar and cervical disk injury, but no herniation.

**Dr. Weinstein, M.D., 3/21/02, (Tr. 313)**
I examined Mr. Davis with regard to the lumbosacral nerve roots.  He has absent ankle jerks and positive straight leg raising at about sixty degrees bilaterally.  In addition, testing for sacroiliac strain produces an awful lot of pain and almost brings him down.

I reviewed the patient's lumbar MRI.  There's really nothing there of major concern and, certainly, nothing that would indicate operative pathology.  The disc bulge is not significant in my opinion.  My opinion is that the patient's problem is in the sphere of connective tissue strain and sprain and I would recommend rigorous physical therapy for both the back and the neck.  If

he can do some walking that would be good and some swim walking would be better.  But, the physical therapy is I think he needs to try to strengthen his connective tissue injury.  He continues to work despite all of his problems.

D.    Testimonial Evidence

Testimony was taken at the May 23, 2006 hearing.  The following portions of the testimony are relevant to the disposition of the case.

[EXAMINATION OF CLAIMANT BY ALJ]  (Tr. 334)

Q    How often in a, in a typical week do you drive?  In other words, how many times a week would you say you're driving your motor vehicle?

A    Approximately one to, one to two times a week, it - -

Q    Typically, typically where are you going when you do that?

A    Just to West Union.

Q    Shopping or - -

A    Take my - - I don't do it now because my daughter's got her drivers' license, but I use to take her to town, we'd pick up like bread or milk, other than that, that was it.

Q    Now you're helping her learn how to drive?

A    Yes.

Q    When you drive at the present time you can travel by yourself?

A    In a short distance, a very short distance to West Union.

*                    *                    *

Q    Now I understand that you had this accident some time in 2002?

A    And two, yes.

Q    And then you went, continued to work but you weren't doing - -

A       I didn't work, I, I rode around in the vehicle with the guy and, and told him which road to turn down to go to check the wells and stuff.

Q       Okay.

A       But it's - -

Q       And, and in any event then you stopped working some time in 2003?

A       Yes.

Q       Okay.   And why, why did you stop doing that then in 2003?

A       The pain got too severe and - -

Q       You - - pain where?

A       In my back, my neck, my lower legs.

                    *                    *                    *

Q       So tell me about - - you had this, you had this accident I guess where you had an accident with you ATV.

A       Yes.

Q       And what, what happened?

A       I was going around my path that I've been going around for years and we come around there and it was just a little slick and just give it just too much gas and it flipped backwards on me and it threw me off and I landed on my back.

Q       Were you, were you the only one - -

A       No.

Q       - - on the machine?

A       No.  There was a fellow that was driving that was in front of me, I mean he was

driving that was in front of me, I mean he was driving the machine and I was sitting behind him.

Q      So what - -

A      And he just give - -

Q      - - were you both - -

A      - - he just give it too much gas and it threw me off backwards and I landed on my back and somehow he got off to the other side of it and the bike come up, upside down straight at me and as I was laying there I caught it.  It was coming right at me and it, and it pinned me on the ground and the handlebars was right in front of my face and my arms was pinned to the ground and I caught - -

Q      So - -

A      - - it with my feet.

Q      - - did he get it off of you then?

A      When I, when I caught it somehow, I don't know how I did it, but I threw it off of me.  My feet like landed, when the bike went upside down I caught it with my hand was pinning me to the ground and my feet caught the back seat or the rack or something and I somehow threw, threw it off of me.

Q      Okay.  Did he get hurt?

A      No, uh-uh.  But I couldn't - -

Q      So - -

A      - - I couldn't move.  I had to, I just laid there for quite a bit before I got up.

Q      Well, did he go and get help or what - -

A      No.  He - - I just told him to let me lay for a little bit because I didn't know

exactly what was hurting.

Q       Uh-huh.

A       And finally got up and I - - he helped me get up on the bike and we went on down

to the truck.

Q       Now when you say bike, I mean - -

A       I'm sorry, it was an ATV, I'm sorry.

Q       - - it was a four-wheeler, okay.

A       Yeah, it was - -

Q       All right.

A       - - ATV.

Q       So, anyway, you had some treatment and then you continued to work on your job

until, until I guess some time in March of 2003?

A       No, I didn't do no work, I just rode around in the truck, I did not get out of the

truck.   I just rode around in the truck to show - -

Q       You rode around in the truck and you told the person what he needed to do?

A       Yeah.  What - -

Q       Okay.

A       - - yeah.

Q       So, why did you then stop working altogether in March of 2003?

A       Well, the whole time I was in the truck with him, I did not stay out there for eight

hours at a time, within five or six hours or four hours or however bad pain I got.  He told me

home at that time and it just got to where the pain got too severe and the doctors told me that no

more riding in the vehicles.

*　　　　*　　　　*

Q       So do you go out, do you have some type of regular program for walking that you do?

A       Yes.  I get up and I every day walk around the house approximately 10 minutes at a time in a day and get some fresh air.

Q       Do you do any exercises, stretching or anything like that for your back or your neck?

A       Yes, I do, try to do a little bit of exercise for my back, which is mostly walking. But when I try to bend the pain is just too severe from trying to bend up and down.

Q       How about your shoulder and your neck, do you do any exercises for those?

A       Yeah.  I, I do one of these numbers, like I'm trying to lift, I don't lift weights but I'll try to do this right here just to keep things from - - because I get muscle spasms real bad in my neck.

*　　　　*　　　　*

Q       So tell me about your daily activities.  Give me a typical day, what time do you get up, what you do in the morning, what you do in the afternoon, what you do in the evening?

A       I get up approximately around 9:00, I get up, go to the kitchen, get me something to eat.  I sit for a couple hours, watch TV then I get up - -

Q       What type of programs do you watch?

A       I watch a lot of hunting shows and a few detective shows and then we get up, I get up because I can't sit very long because of the pain and I get up and I try to get outside if it's not

raining and make a lap around the house and come in and sit - -

Q       Do you feed your dog?

A       No.  The, the kids take care of the ones outside, I don't - - the kids take care of all the animals.

Q       You, when you get up your daughter has already gone to school?

A       Yes, yes.

Q       Okay.

A       My son's at, my son's with me all day, 19-year-old son.

Q       He's not working?

A       No.

Q       Is he, and he's out of school?

A       Yes.  Yeah, he's, he's my right hand man.

Q       So what does, what does he do during the day?

A       Well, he takes care of the animals and, if, if I'm sitting sometimes he'll go get me something to drink or, or something to eat. There's times I get up that I almost fall down, he helps me sometimes to get straightened up.

Q       Do you try to do the dishes or the laundry, do you make the beds?

A       Yes.  I don't make the beds.  I do stand up and try to do dishes, approximately 15 minutes is all I can stand but I'm in pain the whole time, just try to do some kind of activity.

Q       So when you have pain I guess you're talking about pain in your neck or your back or where?

A       My lower back and my neck both, it's always there.

Q       Do you use anything, do you use heat or ice on your neck or your back?

A       I use the heating pad, that's my closest friend.

Q       I'm sorry , what?

A       I said that's my - -

Q       Your closest friend?

A       Yeah.

Q       How often do you use your heating pad?

A       Approximately about three hours in a day.

Q       Does that make the pain go away in your back?

A       It, it don't make it go away, it, it eases it.

Q       And do you do anything for your neck?

A       No.

Q       Do you ever use ice on your neck or your back?

A       Well, I've tried it before but it seems like to me the heat helps better than the ice.

I, I do use horse liniment on my neck at times.

Q       Does that help?

A       Yes, it helps ease the pain.

Q       Now do you do any cooking?

A       I'll, I ain't what you call a cook.  I could fry up a few eggs.

Q       Do you go grocery shopping?

A       No.  My wife does all of it, my wife and daughter.

Q       Do you do any - - you said you walk around outside, do you, do you mow the

lawn?

A        No.  My kids and wife does all that.

Q        When did you last mow the lawn?

A        Just about the time of the accident happened.

Q        Do you have hobbies, things you like to do?

A        Yes, but I don't do them no more.  I use to be a hunter.

Q        Uh-huh.

A        I was a hunter, I liked to hunt, that was my biggest hobby but I can't even walk on

the hill no more so - -

Q        Did you go hunting this season?

A        No.

Q        When's the last time you went hunting?

A        About two years ago I took my daughter, I didn't go - - we didn't - - we got a

little spot in front of the house which is no farther than 100 yards.  My daughter, I don't carry no

weapons or nothing, she does.

Q        So what were you hunting?

A        Deer.

Q        Did you get any deer?

A        No.  She never seen any, we never seen nothing with antlers on it.

Q        What other types of hunting do you, did you do?

A        I did do coon hunting and - -

Q        When's the last time you did coon hunting?

A       The day of my accident, I have not been out since then.

Q       Before or after your accident?

A       The - - after my accident, I haven't been out since.

Q       So the - - who, who takes the, the dog hunting?

A       Nobody, she's been on her leash ever since the accident.  My kids are scared of the dark.

Q       Why is that?

A       They think there's some kind of animals out there that's going to get them or something in the woods at night.

Q       Do you do any fishing?

A       No.  I used to but I haven't done none of that for years.

Q       Do you do any work on the cars, the vehicle?

A       No.

Q       Who takes care of the vehicle?

A       My father and my son helps out.

Q       Do you go to church?

A       No.  I use to, I haven't been there for - -

Q       When's the last time you went to church?

A       Approximately two years ago.

Q       Why did you stop going to church?

A       Just, it's just hard for me to sit in the pews for that period of time.

Q       Now how far can you walk on level ground without having to stop?

A       Approximately 30 feet, 40 feet before I got to stop.

Q       What bothers you after walking 30 or 40 feet?

A       My lower back gives - -

Q       Well, that's - - when you say your lower back you mean at the waist level?

A       Yeah.  Right at my waist level.

Q       What kind of pain do you have?

A       Sharp, stabbing pain.

Q       Do you always get that when you walk 30 or 40 feet?

A       Yes.

Q       Why do you get that?

A       I suppose because of my disk are, are bulging, I guess my - - something back there.  My disk are, are bulging against, pinching against my nerves or something back there.

Q       But they told you they're not going to do any operation on you, right?

A       No, nobody's mentioned nothing about an operation.

Q       So if you walk 30 or 40 feet can you walk, and you rest for a few minutes, can you walk another 30 to 40 feet?

A       Yes.  I rest for about, about five, 10 minutes and then I can walk again, but the pain's always there.

Q       If you're standing at a counter, say folding laundry or washing dishes, can you stand there for a half hour at a time?

A       No, uh-uh.

Q       How long can you stand?

A       Approximately 10 to 15 minutes.

Q       If you sit down for a few minutes can you stand another 10 or 15 minutes?

A       Yeah, I got to sit down for about 10 or 15 minutes before I stand back up again.

Q       Do you have any problems sitting in a chair like you're doing here today?

A       Yes.  I'm very squirmy right now.

Q       Can you not - - only sit for a half hour at a time without having to get up or move around?

A       I can sit but I'm, I'm not sitting still, I'm moving my - - trying to position to keep the, the pain down.

Q       How much weight can you pick up and carry?

A       Approximately 10 pounds.

Q       Can you carry a gallon of milk?

A       Yeah.

Q       A gallon of milk weighs eight to nine pounds, could you carry a gallon of milk in each hand?

A       No.

Q       Why not?

A       It'll just, it would be too much for me to carry because of the pain.

Q       Now do you have a computer at home?

A       Yes.

Q       Do you use it to - -

A       No, I - -

Q - - play games or - -

A - - I don't even - -

Q - - send e-mail?

A - - I don't even know how to turn it on.

Q Who uses your computer?

A My kids and wife.

Q Do you have friends that you see from time to time?

A Yes.

Q What are the occasions when you see the, your friends?

A Mostly my neighbor is, really the only ones I see are my parents or somebody like that stops by and sees me.

Q Does your family get together on holidays like - -

A Yes.

Q - - Christmas, Thanksgiving?

A Yes.

Q Do you do that at your house or over at your parent's house or - -

A Mostly we take turns that whose house we go to.

Q Do you belong to any groups or organizations?

A No.

Q Do you go to your, any of your daughter's school activities?

A Yes.

Q What types of activities do you go to?

A        Her softball, it just finished up, I went to it and - -

Q        She plays softball?

A        Yes.

Q        How, how many games did you see?

A        I seen around 10 of her games.

                    *              *              *

Q        So how long were the games when you went to see them?

A        Three innings each game, so we was there for probably about a half hour.  No, I'd say probably an hour at the most or something like that.  It's only, there only is three innings, they was all shutouts.

Q        Did you sit in the bleachers, did you sit in the bleachers or just stand a lot?

A        I'd stand and I'd sit, I'd get a place where I'd just sit down on the sides of the bleacher and then stand.

Q        Is there other activities that she's involved in during the course of a course of a school year that you go to?

A        Yes.  She's in the band, she's the head majorette at the school. I've been to a couple football games.

Q        Because they perform at half-time?

A        Yes, at the half-time.

                    *              *              *

Q        Okay.  Do you, do you have any trouble dressing yourself?

A        At times I do, I have hard times with my socks and my shoes.

Q        Putting your socks on?

A        Yes.

Q        And what about your shoes, just tying your shoes?

A        Yeah, tying my shoes, bending over.

Q        Do you take care of paying the bills?

A        No my wife takes care of all the paperwork in the household.

Q        Has she always done that?

A        Yes.

Q        Anything else you want to tell me about your condition and why you're not able to work?

A        No.  The, pain is just there and my legs go numb all the time and - -

Q        So, so why are you having this MRI tomorrow?

A        Because - - to see if anything has changed in my, to see if anything has changed.

Q        And that's Med Brook is sending you for the MRI?

A        Yes.

Q        Do you feel that there has been some change in your symptoms?

A        Yes.  It's, it's, to me it's getting worse instead of better.

*                    *                    *

[EXAMINATION OF CLAIMANT BY ATTORNEY]  (Tr. 372)

Q        Do you ever experience severe pain?

A        Yes.

Q        What do you do when you have severe pain?

25

A        My parents or my wife takes me to the hospital to get treatment.

Q        Where do you usually go?

A        To Meadow Brook.

Q        In the past - -

ALJ      Is Med Brook a hospital?

REP      It's an urgent care facility, that's where his doctor is.

ALJ      Okay.

                    *                    *                    *

Q        In the last, say, last couple of years how many times have you gone out there for severe pain?

A        At least once a week.

Q        And what do they do for you?

A        They give me shots for the pain.

Q        Okay.  Do you - - you mentioned earlier about muscle spasms.  How often do you have those?

A        Quite often, probably - - it depends on how I move or something, it could be up to 10 times a day, five times a day.

Q        Where do you have them?

A        In my right shoulder and my neck and in my lower back around my beltline.

Q        Okay.  There's mention in Med Brook records of migraine headaches.

A        Yes.  I get them probably a couple times a week, but when they get severe I get very sick, throwing up and they take me to Meadow Brook to get shots for it.

Q        How often are they that severe?

A        At least once a week.

Q        You'd mentioned earlier also about having swelling in certain areas.  Where do you have the swelling?

A        In my, in my neck and my hands swell up to where they swell up and I, they almost, when they get swelled up they get togetherness like and I can't lift nothing or, or move nothing like that.

Q        How often does that happen?

A        My hands swell up at least a couple times a week.

Q        And you mentioned also problems reaching above your head, is that with one arm or both arms or - -

A        Well, with my right arm I can't lift it up over my head, my left arm I can.

Q        But what keeps you from lifting it above your head?

A        The, the - - something back there, my disk that are pinching against my nerves just won't let me lift it there because the pain is severe.

Q        Are there any side effects from your medications?

A        Yes, they make me sleepy, tired.

Q        Do you know which ones?

A        My Darvocets and my muscle relaxers and my Percocets, I take them at nighttime for, to where I could rest halfway decent.

Q        How do you sleep at night?

A        Very poorly.

Q        And why is that?

A        Because of the, the pain, I just can't lay in one position, I can't lay on my right side or my back, that's why I lay on my left side.  So that when I do get, my left side gets sore laying on it, I try to lay on my right side and when I do after 10, five to 10 minutes, then I got to move again.

Q        Do you lie down during the day?

A        Yes.

Q        How much?

A        Probably six hours or so.

Q        Why so many?

A        Because the, it helps to - - when I straighten out instead of sitting or standing, it helps when I lay down on the bed.  It, it helps to relieve a little pain but the pain's there.

*                    *                    *

[EXAMINATION OF VOCATIONAL EXPERT BY ALJ]  (Tr. 376)

Q        For the claimant's past relevant work would you identify the jobs from the standpoint of how they're characterized in the Dictionary of Occupational Titles?  The skill level, the exertional level and if he performed them differently than how they're customarily performed, tell us how they're customarily performed in the national economy.

A        Yes, your Honor.  His, his most recent job he described as a roustabout, according to the DOT would be roustabout, heavy and skilled.  He, the work he did working for Asland, that of a tree trimmer would be according to the DOT heavy and skilled.   And his work as a surveyor's helper, according to the DOT that is medium and semiskilled.

28

Q        Okay.  So basically we have skilled and semiskilled work?

A        Yes, Your Honor.

Q        I want you to assume that the claimant would be limited to medium work but wouldn't be able to do any overhead reaching.  Would he be able to do any of his past relevant work?

A        No, Your Honor.

Q        I want you to assume a hypothetical individual the same age, education and work experience as the claimant that would be limited to doing light work, could stand and walk six hours in an eight-hour day.  Couldn't stand or walk any more than a half-hour at a time and then would have to sit down for a few minutes.  Could sit for six hours in an eight-hour workday but couldn't sit for more than a half-hour at a time.  He'd have to be able to move around for a few minutes.  Would there be any full-time, unskilled jobs that hypothetical person could do in the local or national economy, and if you'd identify the local economy?

A        Yes, Your Honor, and I'll define the local economy as 20 percent of all jobs in the state of West Virginia based on Bureau of Labor Statistics.  There would be the work of a sewing machine operator, in the local economy there are 69 jobs, in the national economy there are 114,248 jobs.  There would be the work of a parking lot attendant, in the local economy there are 39 jobs, in the national economy, 42,258 jobs.

Q        Any other?

A        Not at the light level, Your Honor.

Q        Okay.  So we've got sewing machine operator and parking lot attendant?

A        Yes, Your Honor.

Q        I want you to assume a hypothetical individual the same age, education and work experience as the claimant, has the ability to do sedentary work - - well, I'm going to strike that. Would have the ability to do, could lift or carry 10 pounds frequently, 20 pounds occasionally, could stand or walk for two hours in an eight-hour workday, could sit for six hours in an eight-hour workday.  Would there be any full-time, unskilled jobs that the hypothetical person could do in the local or national economy?

A        Read over that again, Your Honor, the limiting facts - -

Q        Right.  Basically the person could do - -

A        Lift and carry 10 pounds - -

Q        Frequently.

A        - - and 20 pounds occasionally.

Q        Could sit for six hours and could stand or walk for a total of two hours, could sit for six hours in an eight-hour workday.

A        Okay.

Q        And - -

A        Sitting would, the classification we're talking about, whether it be sedentary or light?

Q        Right.  In other words, conceivably this person would be able to do some jobs that might be more than sedentary and he could do them sitting down because he can lift or carry more than 10 pounds.  There may not be any jobs but that's - - so I'm not necessarily saying you can't give me sedentary jobs there.

A        Yes, Your Honor.  There would be the work of a surveillance system  monitor,

that is a sedentary job, there are 13 jobs in the local economy, 12,947 in the national economy. There would be the work of a table worker, in the local economy, it's a sedentary job.

Q      Okay.

A      In the local economy there are 13 jobs, in the national economy, 14, 075 jobs. There, there would be the work of an anthill sealer, that is a sedentary job, in the local economy there are seven jobs, in the national economy there are 10,560 jobs. In the Dictionary at the light level there would be the work of parking lot attendant, and as indicated previously there are 39 jobs in the local economy, 42,258 in the national economy. There are, would be the job of a sewing machine operator, in the local economy there are 69 jobs, in the national economy, 114,248 jobs.

Q      All right. I'm going to ask you another hypothetical at the sedentary level, but in addition there'd be though the individual would have to be able to change position to standing or walking about once every 20 minutes and to sitting about once every half hour. Would there be any full-time, unskilled jobs that the hypothetical person could do in the local or national economy at the sedentary level with that additional limitation? With respect to standing and sitting, walking and sitting.

A      There would be, the hypothetical would be the same as number two but you're more clearly defining - - well, on to see the weight, lifting and carrying - -

Q      It would basically be sedentary, so it would only be 10 pounds - -

A      Okay.

Q      And it, in addition to the normal breaks and lunch breaks and the person would have to be able to change position about once every hour of sitting and once every 20 minutes of

standing.

A	And in this hypothetical would the individual be changing their posture, for example, from, from sitting to standing for how long or - -

Q	Well, they - -

A	- - is this, is there an assumption that the individual could continue working while - - after having changed posture?

Q	The - - well, from the sitting standpoint if it's, if it's a job where, a sedentary job he's going to be sitting down most of the time.

A	Yes.

Q	But he would have to be able to get up for a few minutes, two to three minutes and move around for, you know, to change his position, then he could go back to sitting.  If standing or walking I'm just saying he can't, he wouldn't be able to do any more than 20 minutes of standing or walking.

A	Okay.  All right, then this individual can perform the work of a surveillance system monitor, the numbers would be the same as I testified, would you like me to recite the numbers?

Q	Let's see, you gave them to us once before and –

A	Yes.

Q	– I guess it was 69 and –

A	Well, surveillance system monitor is 13 in the local economy, 12,947 in the national economy.  The work of a table worker, this individual can still perform that job at the required levels of productivity.  There are 13 jobs in the local economy, 14,075 in the national

economy. And there would still be work, anthill sealer, with seven jobs in the local economy, 10,560 in the national economy.

Q        And the local economy has –

A        Twenty percent of all jobs in the state of West Virginia based on the Bureau of Labor Statistics.

Q        Okay. All right, now I want you to assume a hypothetical individual the same age, education and work experience as the claimant that would be limited to light or sedentary work. But due to his impairments he would be off task for two hours out of an eight-hour workday. Are there any full-time, unskilled jobs that the hypothetical person could do in the local or national economy?

A        No, Your Honor, there would be no jobs for this hypothetical individual.

Q        Same question with the person would be absent from work two days a month, would there be any full-time, unskilled jobs that the hypothetical person could do in the local or national economy?

A        No, Your Honor, there would be no jobs for this hypothetical individual.

*          *          *

E.        <u>Lifestyle Evidence</u>

The following evidence concerning the Claimant's lifestyle was obtained at the hearing and through medical records. The information is included in the report to demonstrate how the Claimant's alleged impairments affect his daily life.

•        Daily routine consists of: get up, eat toast, take pills, brush teeth, get dressed, throw covers on bed, walk around house, watch TV, pick up a little in living room, talk on

phone, go outside to walk around yard for exercise, shower, eat.  (Tr. 89)

- Able to care for personal needs and grooming without special reminders.  (Tr. 91)

- Folds clothes and sets table about 3 x per week.  (Tr. 91)

- Walks around outside a little every day.  (Tr. 92)

- Able to drive into town.  (Tr. 92)

- Able to pay bills, count change, handle a savings account, use a checkbook/money order.

  (Tr. 92)

- Watches TV.  (Tr. 93)

- Talks with parents on phone daily.  (Tr. 93)

- Goes to church once in a while.  (Tr. 93)

- Goes to sports events.  (Tr. 93)

- Drives car one to two times per week.  (Tr. 342)

- Walks around the house for 10 minutes at a time every day.  (Tr. 361)

- Can stand for 10-15 minutes at a time.  (Tr. 367)

- Can pick up and carry approximately 10 pounds.  (Tr. 368)

- Can carry a gallon of milk.  (Tr. 368)

- Visits with neighbor in own house.  (Tr. 369)

- Attends daughter's softball games and band performances.  (Tr. 369-70)

### III.  The Motions for Summary Judgment

A.  <u>Contentions of the Parties</u>

Claimant contends the ALJ 1) erred during Step Five of the sequential analysis by failing to find he was disabled; 2) failed to present to the VE the entire combination of limitations contained

in Claimant's RFC; 3) failed to properly consider the opinions of Dr. Nelson, Ms. Wentz, Dr. Labatia, and Dr. Franyutti; 4) failed to properly assess the credibility of Claimant's assertions of pain.

Commissioner did not respond to Claimant's first issue. As to Claimant's second, third, and fourth issues, Commissioner responds, respectively, 2) the ALJ posed a proper hypothetical to the VE; 3) the ALJ properly discredited the opinions of Dr. Nelson, her assistant Ms. Wentz, and Dr. Labatia, and accepted, rather than rejected, Dr. Franyutti's opinion; 4) the ALJ properly evaluated the credibility of Claimant's subjective symptoms.

B.    The Standards.

1.    Summary Judgment. Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). All inferences must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2.    Judicial Review. Only a final determination of the Commissioner may receive judicial review. See, 42 U.S.C. §405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir.

1986).

3.     Social Security - Medically Determinable Impairment - Burden. Claimant bears

the burden of showing that she has a medically determinable impairment that is so severe that it

prevents him from engaging in any substantial gainful activity that exists in the national

economy.  42 U.S.C. § 423(d)(1), (d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

4.     Social Security - Medically Determinable Impairment.  The Social Security Act

requires that an impairment, physical or mental, be demonstrated by medically acceptable

clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); Throckmorton v. U.S.

Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§

404.1508, 416.908.

5.     Disability Prior to Expiration of Insured Status- Burden.  In order to receive

disability insurance benefits, an applicant must establish that he was disabled before the

expiration of his insured status.  Highland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42

U.S.C. §§ 416(I), 423(c); Stephens v. Shalala, 46 F.3d 37, 39 (8th Cir.1995)).

6.     Social Security - Standard of Review.  It is the duty of the ALJ, not the courts, to

make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to

determining whether the findings of the Secretary are supported by substantial evidence and

whether the correct law was applied, not to substitute the Court's judgment for that of the

Secretary.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.     Social Security - Scope of Review - Weight Given to Relevant Evidence.  The

Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently

explained his rationale in crediting certain evidence in conducting the "substantial evidence

inquiry." Milburn Colliery Co. v. Hicks, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence. Gordon v. Schweiker, 725 F.2d 231, 235-36 (4th Cir. 1984).

 8. Social Security - Substantial Evidence - Defined. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

 9. Social Security - Sequential Analysis. To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether he has a severe impairment, 3) whether his impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform his past work; and 5) whether the claimant is capable of performing any work in the national economy. Once claimant satisfies Steps One and Two, he will automatically be found disabled if he suffers from a listed impairment. If the claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job. Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

C. Discussion

 1. Whether the ALJ Erred at Step Five of the Sequential Analysis By Concluding Claimant Was Not Disabled.

Claimant contends the ALJ erred at step five of the sequential analysis because he concluded Claimant retained the RFC for part-time work, yet found Claimant was not disabled.

Commissioner failed to respond to this issue.

The ALJ in the present case found Claimant retained the RFC to perform light work, with the limitation that "he cannot sit or stand/walk for more than six hours out of an eight hour workday; he cannot do any work that requires overhead reaching." (Tr. 16). Claimant argues that because his RFC limits his sitting/standing/walking to less than 8 hours, he is unable to work a full day, and therefore disabled. In so arguing, Claimant relies on Hines v. Barnhart, 453 F.3d 559, 562 (4th Cir. 2006), wherein the Court explained an individual's RFC "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. . . . A 'regular and continuing basis' means 8 hours a day, for five days a week, or an equivalent work schedule." Id., quoting SSR 96-8p.

The Court disagrees with Claimant and finds the ALJ properly concluded Claimant's RFC did not render Claimant disabled. Although Claimant's RFC limited his sitting, standing, and walking, his RFC merely tracks the definition of "light work." See SSR 83-10. As explained in SSR 83-10, the full range of light work requires an individual be able to stand or walk, off and on, for a total of approximately 6 hours of an 8-hour workday. It also explains "sitting may occur intermittently during the remaining time." SSR 83-10. Accordingly, the ALJ's conclusion Claimant could sit or stand/walk for up to 6 hours of an 8-hour workday merely evidenced the ALJ's belief Claimant could meet the sitting/standing/walking requirements of light work, not that Claimant was capable of only part time work. (See Kelley v. Apfel, 185 F.3d 1211, 1215 (11th Cir. 1999) [holding the ALJ's finding the claimant could sit for 6 hours of an 8 hour workday and stand or walk for 2 hours of an 8 hour workday did not equate to a finding the claimant could do only part-time work, but rather that the claimant

retained the RFC to do full-time sedentary work.].  Providing support for the Court's finding is the fact the ALJ, after posing the sitting/standing/walking limitations to the VE, asked whether there existed any "full-time" jobs that accommodated such limitations.  (Tr. 378).

    2.    <u>Whether the ALJ Erred at Step Five of the Sequential Analysis By Failing to Present a Proper Hypothetical to the VE</u>.

Claimant contends the ALJ failed to meet his burden at step five because he failed to include in the hypothetical to the VE the entire combination of impairments set forth in Claimant's RFC.  More specifically, Claimant contends the ALJ presented six short hypotheticals to the VE, none of which contained all of the limitations contained in Claimant's RFC.  Commissioner contends the ALJ posed a proper hypothetical to the VE.

During step five of the sequential analysis, the ALJ is responsible for reasonably setting forth all of Claimant's impairments in the hypothetical posed to the VE.  <u>Walker v. Bowen</u>, 889 F.2d 47, 50 (4th Cir. 1989); SSR 96-5p (1996).  In other words, the hypothetical must "adequately reflect" a persons's impairments.  <u>Johnson v. Barnhart</u>, 434 F.3d 650, 659 (4th Cir. 2005).  However, the ALJ's hypothetical need only include those limitations supported by the record.  <u>Id.</u>  The limitations and impairments included in the hypothetical should reflect the Claimant's RFC.   20 C.F.R. § 404.1545, SSR 96-8p.

The ALJ in the present case posed the following hypothetical to the VE: "I want you to assume a hypothetical individual the same age, education and work experience as the claimant that would be limited to doing light work, could stand and walk six hours in an eight-hour day.  Couldn't stand or walk any more than a half-hour at a time and then would have to sit down for a few minutes.  Could sit for six hours in an eight-hour workday, couldn't sit for more than a half-hour at a time.  He'd have to be able to move around for a few minutes." (Tr. 378).  The VE

responded the jobs of sewing machine operator and parking lot attendant were available. (Tr. 378). The ALJ then revised the hypothetical, reducing the sitting/standing/walking requirements, adding limitations on lifting, and adding a "change of position" requirement. (Tr. 378-382). The VE responded there existed sedentary and light jobs that accommodated the limitations of the hypothetical person. (Tr. 378-382). Finally, the ALJ revised the hypothetical to include the need to be off task two hours of an eight-hour workday or absent two days a month. The VE responded there did not exist any jobs to accommodate such an individual. (Tr. 382).

The Court agrees with Claimant and finds the ALJ erred in step five because the ALJ failed to include in any of the hypotheticals to the VE the entire combination of Claimant's limitations as contained in the RFC. Specifically, the ALJ failed to mention a limitation on overhead reaching - a limitation the ALJ had himself included in Claimant's RFC. See 20 C.F.R. § 404.1545, SSR 96-8p. Nevertheless, the Court finds the ALJ's error is harmless because there is no evidence the ALJ's erroneous omission altered the outcome of step five. Rather, the jobs cited by the VE, those of parking lot attendant and sewing machine operator, accommodate Claimant's sitting/standing/walking limitations and do not require any overhead reaching. See Dictionary of Occupational Titles, Code 915.473-010 (parking lot attendant), and Code 787.862-046 (sewing machine operator (any industry)).[7] Accordingly, remand is not necessary. See Mickles v. Shalala, 29, F.3d 918, 921 (4th Cir. 1994) [holding remand is not necessary, despite ALJ's initial error, where ALJ would have reached same result notwithstanding his error.].

---

[7] Available at http://www.occupationalinfo.org/dot_index.html#P. Last accessed April 3, 2008.

3.    Whether the ALJ Failed to Properly Consider the Opinions of Dr. Nelson, Ms. Wentz, Dr. Labatia, and Dr. Franyutti.

Claimant contends the ALJ erroneously rejected the opinion of Dr. Nelson, Dr. Nelson's assistant Ms. Wentz, Dr. Labatia, and Dr. Franyutti.  Commissioner contends the ALJ properly discredited Dr. Nelson's, Ms. Wentz's, and Dr. Labatia's opinions, and accepted, as opposed to rejected, Dr. Franyutti's opinion.

Dr. Nelson

Dr. Nelson, M.D., of Medbrook Medical Associates, treated Claimant from February 2002 until May 2006.  (Tr. 166-305).  Contrary to Claimant's assertion, there is no evidence the ALJ rejected any reports or opinions of Dr. Nelson.  Rather, the ALJ's decision reflects his rejection of "Exhibit 8F."  Exhibit 8F, as explained below,  is comprised of reports from Ms. Wentz, Dr. Nelson's assistant.  Accordingly, Claimant's assertion with regards to Dr. Nelson is without merit.

Ms. Wentz

Ms. Wentz, PA-C, Dr. Nelson's assistant, also treated Claimant at Medbrook Medical Associates.  In fact, it is apparent Ms. Wentz, as opposed to Dr. Nelson, treated Claimant on the majority of occasions.  In July 2004, Ms. Wentz reported Claimant "is unable to actively do any work at this time."  (Tr. 181).  In December 2005, Ms. Wentz indicated on a work excuse form Claimant was "unable to participate in work from 4/03 till present." (Tr. 293).  Thereafter, in January 2006, Ms. Wentz completed a "Medical Assessment of Ability to do Work-Related Activities (Physical)" and described Claimant's work-related functional limitations.  (Tr. 290-92).

The ALJ considered the work excuse form and the Medical Assessment and concluded,

"Exhibit 8F [is not from an acceptable medical source. The undersigned notes that opinions from a chiropractor are not considered to be 'acceptable sources' of medical evidence by the regulations. Rather, these opinions are accorded no more weight than opinions of public and private social welfare agencies, observations by non-medical sources, naturopaths, or physician assistants. (Compare 20 C.F.R. § 416.913(a) with 20 C.F.R. § 416.913(d)).

(Tr. 17).

The Court agrees with Claimant and find the ALJ erred in rejecting the opinion of Ms. Wentz. First, there is no evidence Ms. Wentz is a chiropractor. Rather, Ms. Wentz is identified as a PA-C, or physician's assistant. Second, even if the ALJ had accurately identified Ms. Wentz as a physician's assistant, he was not justified in completely disregarding her reports. While an ALJ may disregard a physician assistant's opinion as to the existence of a medically determinably impairment, see 20 C.F.R. §§ 404.1513(c), an ALJ may not completely disregard a physician assistant's opinion on how a claimant's impairment, including any accompanying pain, affects the claimant's ability to work. See 20 C.F.R. §§ 1513(d), 1529(a). Rather, the ALJ must, at a minimum, consider the evidence and the extent to which it is consistent with the record as a whole. Id. Because Ms. Wentz's reports discussed the impact of Claimant's pain on his lifestyle, (Tr. 290), and because the ALJ summarily rejected Ms. Wentz's opinions, it is recommended the case be remanded for further consideration of Ms. Wentz's reports and their bearing on Claimant's RFC.

Dr. Labatia

Dr. Labatia examined Claimant in October 2004. (Tr. 151). Post-examination, Dr. Labatia concluded Claimant could not "function reasonably at any job setting due to combination of multiple problems that result in significant impaired ability to stand, walk or sit and there is also significant impairments in ability to do any reasonable lifting, pulling, pushing,

bending, stopping or twisting." (Id.). Dr. Labatia also concluded Claimant was not able to climb ladders or drive large amounts. (Id.) The ALJ rejected Dr. Labatia's opinions as being unsupported by objective medical evidence, including MRI results. (Tr. 17).

The Court finds the ALJ's rejection of Dr. Labatia's opinions is supported by substantial evidence, namely Dr. Franyutti's and Weinstein's report, (Tr. 156, 313), MRI results showing the absence of stenosis, herniation, fracture, or any acute abnormalities, (Tr. 243-45, 248-51, 309), and Claimant's lifestyle evidence. Accordingly, Claimant's assertion with regards to Dr. Labatia is without merit.

Dr. Franyutti

Dr. Franyutti, a state agency consultative examiner, reviewed Claimant's file in November 2004 and concluded Claimant retained the ability to perform sedentary work. (Tr. 146). The ALJ considered Dr. Franyutti's report and "basically" agreed with the report "to the extent that they show that the claimant's ability to perform exertional work or non-exertional work requirements are not grossly restricted, and to the extent that the opinions seem consistent with the majority of the objective findings in the medical evidence." (Tr. 17). The ALJ ultimately adopted Dr. Franyutti's recommended limitations on sitting, standing, walking, lifting, carrying, and reaching and assigned Claimant an RFC of a limited range of light work. Although the ALJ rejected Dr. Franyutti's recommended RFC of sedentary work, substantial evidence, including Dr. Franyutti's own findings as to Claimant's exertional and non-exertional limitations, supports the ALJ's decision. Accordingly, Claimant's assertion regarding the ALJ's treatment of Dr. Franyutti's report is without merit.

4.      Whether the ALJ Erred in Evaluating the Credibility of Claimant's Subjective Symptoms.

Claimant contends the ALJ did not properly assess the credibility of his allegations of pain and accompanying limitations. Specifically, Claimant contends the ALJ engaged in "selective citation," a tactic forbidden by the Fourth Circuit. Commissioner responds the ALJ complied with controlling regulations - 20 C.F.R. §§ 404.1529, 416.929 - and reasonably concluded the objective medical evidence and Claimant's lifestyle evidence did not support the degree of pain and limitation alleged by Claimant.

The Fourth Circuit, in Craig, 76 F.3d at 585, set forth the standard for evaluating the impact of a claimant's subjective symptoms, including pain, on their ability to work . Under Craig, when a claimant alleges disability from subjective symptoms such as pain, he must first show the existence of a medically determinable impairment that could cause the symptoms alleged. Id. at 594. The ALJ must "expressly consider" whether a claimant has such an impairment. Id. at 596. If the claimant makes this showing, the ALJ must next determine the extent to which the subjective symptoms impair the claimant's ability to work. Id. at 595. In such a determination,

> "Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or the severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers."

Id. at 595. As long as the ALJ follows the legal mandates of Craig, his factual determinations will be upheld so long as they have substantial evidence to support them. Milburn Colliery Co., 138 F.3d at 528.

In accordance with the first step of Craig, the ALJ found Claimant suffered from the following severe impairments, "which can reasonably be expected to cause pain:" cervical

strain/sprain; lumbar strain/sprain; and carpal tunnel syndrome bilaterally." (Tr. 12, 16). In accordance with step two of <u>Craig</u>, the ALJ evaluated the objective evidence and Claimant's lifestyle evidence and concluded the Claimant's allegations of the nature and extent of his pain were not fully credible. (Tr. 16). In so concluding, the ALJ relied in part on Claimant's retained ability to cook, clean, drive, walk, hunt, and attend his child's school activities, as well as Dr. Franyutti's conclusion Claimant retained the RFC to perform sedentary work. (Tr. 16-17). The Court finds the ALJ's conclusion in step two is supported by substantial evidence, namely Claimant's MRI results and the reports from Drs. Franyutti, Weinstein, and Snead. (Tr. 156, 241-252, 309, 313). However, because the ALJ erroneously disregarded Ms. Wentz's reports, and because it is not the Court's role to weigh the evidence, <u>see</u> <u>Hays</u>, 907 F.2d at 1456, it is recommended the case be remanded for further consideration of Ms. Wentz's reports and their bearing on Claimant's credibility.

### IV. Recommendation

For the foregoing reasons, I recommend that:

1. Claimant's Motion for Summary Judgment be **<u>GRANTED</u>** because although there is no merit to Claimant's first contention, harmless error marred the ALJ's hypothetical to the Vocational Expert, ["VE"], and the ALJ properly evaluated the reports of Dr. Nelson, Dr. Labatia, and Dr. Franyutti, the ALJ erroneously dismissed Ms. Wentz's opinions as being from an unacceptable medical source. Because it is not the Court's role to weigh the evidence, the Court recommends remand for further consideration of Ms. Wentz's reports and their bearing on Claimant's credibility and RFC.

2. Commissioner's Motion for Summary Judgment be **<u>DENIED</u>** for the same

reasons set forth above.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after the date of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.


DATED: April 30, 2008

<u>/s/ James E. Seibert</u>
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE